## FRANK PHELPS V. THE STATE.

No. 17983. Delivered February 26, 1936.
Rehearing Denied April 8, 1936.

The opinion states the case.

*Sam Hocker,* of Clarksville, for appellant.

*Lloyd W. Davidson*, State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, four years in the penitentiary.

The facts are in much conflict. The testimony for the State shows that appellant and his witnesses were going to camp and fish at night, and were joined by deceased. The party was in a wagon. They passed the house of McCain, a brother-in-law of deceased. The latter went into said house accompanied by Sam Dora, who later came out, got in the wagon with appellant and his brothers, and they went on down to the place on the river where they were going to fish. Mr. McCain testified that about an hour later he and deceased went together to where said party was. It was a moonlight night. The entire party were drinking whisky. He testified that they sat around and talked, and presently appellant said to deceased that he wanted to talk to him, and they walked off about sixty steps, and the first thing witness knew appellant and deceased were fighting. Deceased broke loose from appellant and ran. When he did so appellant said "Run, you s-n of a b; if I hadn't broken my knife blade off in you I would have cut you plumb in two." He further said that one of appellant's brothers then told him, witness, that if he did not run he would cut him wide open, and witness ran. He next saw deceased at the home of witness later that night. Deceased was cut across the stomach, his entrails hanging out, and was cut in another place on the stomach, once in the side and once across the neck. Deceased died the next day from the effects of said cutting. His dying declarations were in evidence, and were, in effect, that the trouble was caused by a fight had by him with Bud Phelps during Christmas week; that when appellant called him off from the camp fire the night of the cutting, he told deceased, after they got apart, that he was going to kill him; that he had hit his last Phelps; also that the first thing he knew Frank Phelps was on him, cutting him with a knife, and cursing and abusing him.

The testimony for the defense, including that of appellant, was in substance that Sam Dora came back to the wagon, after going with deceased to the house of McCain on the night in question, and told appellant that he heard deceased say to McCain up at the house that he was going to get him,—or going to kill him, Frank Phelps, that night. The defense witnesses also agreed in testifying that after they got to the river they built up a big fire, and that appellant was engaged in patching their net, using thread and a knife in so doing, when

deceased came down to the camp; also that when said parties came up deceased walked at once to where appellant was sitting on his "hunkers" and kicked appellant over his left eye, kicking him over on his back, and that deceased then got on or jumped on appellant. Appellant testified to the same facts. He swore that he was sitting down sort of on his heels and feeling along the net, and that deceased walked up to him and said "All right, I got you now," and kicked him over the left eye. He further testified that deceased then said: "I am going to kill you, you s——n of a b——h." When deceased kicked him he put him right flat on his back, and that deceased came right down on top of him, and had a knife in his hand, and caught him with the knife along his shirt-sleeve, and hit him two or three times with the knife before he got hold of his arm; that he, appellant, rolled and tried to push him off, still having in his hand his knife; that he cut deceased at that time because he was afraid he was going to hurt him; that he cut him to protect himself; that at the time he cut him deceased was on top of him, and was cutting at him at that time; that presently deceased jumped back off of him and went off, and as he walked away he looked back and said "I am going up to Hubert McCain's and get a gun." Appellant testified: "I state to this jury that the only reason I cut Hood Brown was to get him off of me, and to protect myself." On cross-examination appellant repeated the fact that he was working on the net when deceased and McCain came to the camp; that McCain said a word to some of the others, and deceased "Stepped over there and kicked me. He did that before he said anything. He said 'You son of a bitch, I am going to get you tonight.' He said that after he kicked me over. When he kicked me he just had his hands holding them down, and he had a knife in his hand when he kicked me, and had it open. He had his knife in his hand and had it open when he walked up and kicked me over and jumped down on top of me, and he cut my sleeve and just grained the hide down the left arm. * * * He had me down and was on top of me, and had the knife in his hand when he kicked me. He cut me one place on the arm. While he was doing that I was trying to get him off of me. I had my knife in my hand, and was down flat on my back. Hood was sitting just sort of astraddle of me. I had my knife in my right hand. That is the hand I did the work with, * * * I cut him while he was on me. * * * I cut him while he was on me. * * * When he came up and kicked me I didn't have time to say anything. * * * What I did during the fight I was flat on

my back, and he was sitting on me right across here. * * * I had my knife in my right hand and I was using it I guess. I was cutting him." The facts seem to justify the conclusion of the jury.

Appellant's bill of exceptions No. 1 complains of the exhibition of the garments worn by deceased at the time of the cutting. We are unable to agree that this bill presents error. The cut places in the garments were illustrative of the position of the parties and the number of the cuts and other material facts shedding light on the contradictory testimony for the State and the defense. In such case we have always held such testimony admissible. Bill of exceptions No. 2 complains of the same testimony.

Bill of exceptions No. 3 complains of the charge of the court in that the relative size and strength of the parties was referred to therein. We see no error in this. Bill of exceptions No. 4 complains of the refusal of a special charge, which seems to us to be fully covered by the main charge given by the court.

Bill of exceptions No. 5 brings forward an exception to the charge of the court for its failure to submit the law of self-defense predicated on threats. As we view this case, there was no issue as to who began the difficulty such as to call for a charge on communicated threats. The transactions related by the State witnesses are so widely different in every way from those relied on by the witnesses for the defense as that we are unable to see how a charge on threats could have been of any assistance to the jury or of any avail to the accused. According to the testimony of all the defense witnesses, appellant had an absolute right to defend himself against an actual attack accompanied by danger, and in such case we have often said that there is no need for the submission of the law of threats. See Chalk v. State, 35 Texas Crim. Rep., 129; Barnes v. State, 39 Texas Crim. Rep., 184; Bankston v. State, 76 Texas Crim. Rep., 507; Rodriguez v. State, 79 Texas Crim Rep., 631; Roberson v. State, 83 Texas Crim. Rep., 246; Fielding v. State, 48 Texas Crim. Rep., 334. What we have just said applies to the alleged error of the refusal of a special charge, complaint of which appears in bill of exceptions No. 6. We have reviewed each of appellant's other bills of exception, and find nothing in any of them supporting any theory of error.

The judgment will be affirmed.

*Affirmed.*

## ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—It is further insisted that bill of exception number one complaining of the use in evidence of the clothing worn by deceased at the time of the difficulty presents reversible error. The bill is quite brief. The objection urged was that the only purpose in exhibiting the clothing was to inflame the mind of the jury, and because they were exhibited while the State was making out its case in chief, and not in rebuttal. It is impossible for us to say from the recitals in the bill that the clothing did not throw light upon the position of the parties when the cuts upon deceased were inflicted. The statement in the bill that the only purpose was to inflame the mind of the jury was a ground of objection only. The statement of facts reveals that the State's contention was that deceased and appellant were standing up when the wounds were inflicted, while appellant's contention was that both he and deceased were on the ground, deceased being on top of appellant when the wounds were inflicted. It is quite possible that the trial court, who could see the clothing and the cuts therein, thought they would aid in solving the very sharply controverted issue.

We think it immaterial that the evidence objected to came into the record upon the development of the case in chief if it became pertinent by reason of conflicts in the testimony which later arose. While the facts are quite different, application of the same principle will be found in Gregory v. State, 92 Texas Crim. Rep., 574, 244 S. W., 615; Klein v. State, 104 Texas Crim. Rep., 189, 283 S. W., 791; Murley v. State, 105 Texas Crim. Rep., 276, 288 S. W., 441; Mirales v. State, 112 Texas Crim. Rep., 67, 13 S. W. (2d) 868.

The other ground upon which appellant urges his motion for rehearing is that the trial court erred in the charge given upon communicated threats. It is perhaps subject to some of the criticism directed against it, but the authorities cited in our original opinion clearly show that it would not have been error to omit any instruction whatever upon the subject under the facts of this case. Appellant seems to have gotten more than he was really entitled to, hence we deem any error that might have occurred in the instruction given would not call for a reversal.

The motion for rehearing is overruled.

*Overruled.*

MORROW, P. J., absent.